UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DEXTER FRANCIS,

                              Petitioner,

                                                      **MEMORANDUM & ORDER**

          -against-
                                                      02 CV 0468 (RJD)


UNITED STATES OF AMERICA,

                              Respondent.
--------------------------------------------------------X
DEARIE, Chief Judge.

        Dexter Francis, an illegal alien from Trinidad in federal custody pursuant to the judgment

of this Court issued April 5, 2000, moves pursuant to 28 U.S.C. § 2255 to vacate his conviction

and sentence.  Arguments based on Apprendi v. New Jersey, 530 U.S. 466 (2000), and Booker,

543 U.S. 220 (2005) underlie most of Francis's claims.

        For the reasons set forth below, the motion is denied and the application is dismissed.

                              **BACKGROUND**

        Following a trial before this Court in September 1999, a jury convicted Francis of eleven

crimes, including racketeering and murder, relating to acts Francis committed or authorized as

leader of a gang of drug dealers, the "Cool Operators," based in the Crown Heights section of

Brooklyn.   This Court sentenced Francis as follows (all concurrent):  life terms on the

racketeering, racketeering conspiracy, and substantive murder counts; ten years on each of the

two murder conspiracy counts; twenty years on each of the two robbery conspiracy counts; and

forty years on the marijuana conspiracy count.  The judgment also imposes two terms of twenty

years and one term of five years on the firearms counts, each to be served consecutively to all

other counts.  On December 22, 2000, the Second Circuit affirmed Francis's convictions in a

comprehensive decision reviewing the underlying facts, few of which will require restatement here. United States v. James, *et al.*, 239 F.3d 120 (2d Cir. 2000), cert. denied sub nom. Francis v. United States, 532 U.S. 1000 (2001).

The principal trial evidence against Francis was the testimony of cooperating co-defendants, who detailed Francis's leadership role in Cool Operators and in the "turf wars" that culminated in Francis's murder of Ken Pierre, and the murder of Gerard Griffith, which Francis personally ordered. See James, 239 F.3d at 121-22 (Second Circuit's view of trial record confirms this Court's first-hand observation). Francis did not testify or call witnesses on his behalf. Instead, given the extensive criminality of the cooperators, the principal defense strategy, as zealously advanced by appointed trial counsel Mitchell Golub, was to assail credibility. See, e.g. Tr. 1672-1713 (Golub summation). Accord James, 239 F.3d at 122-26 (discussing the centrality to Francis's defense of the challenge to cooperator credibility).

With respect to the single narcotics count (a marijuana conspiracy) at the heart of his several Apprendi- and Booker-based claims, Francis essentially conceded his guilt. In his summation on Francis's behalf, Golub began: "I started, in my opening statement, telling you that one thing that the government is going to show you, and we are not disputing it, is that my client was definitely involved in the selling of marijuana." Tr. at 1672. Golub argued to the jury that Francis was not guilty of the robberies, the murders, and the racketeering charged in the indictment, but conceded that, "[t]here's a separate marijuana conspiracy charge and we will talk about that afterwards, that there is possibly some measure of validity to." Tr. at 1673. Golub did return to the marijuana charge at the close of summation, stating only that "[m]y client may have been a marijuana supplier to Trevor John [the principal cooperator], among other people, but that was all. He wasn't part of [the] robberies . . .[or the] homicide[s]." Tr. 1712-13.

On the sole subject of possible consequence under <u>Apprendi</u>—drug quantity—the cooperator testimony revealed that Francis oversaw a network of at least six different "weed spots" where marijuana was sold, for periods ranging from five months to between two and three years, at the rate of a pound or more per day.  <u>See</u>, <u>e.g.</u>, Tr. 230, 271, 970-72, 974, 456, 477.  <u>See also</u> Tr. at 223-27, 458, 1079-80 (describing transactions involving 12-15 pounds, 70-75 pounds, and 150-200 pounds of marijuana).  Using straightforward arithmetic, this testimony established that Francis was responsible, through the organization he oversaw, for the distribution of more than 700 kilograms of marijuana.[1]  Although Golub conducted vigorous cross-examinations on other matters, his questions did not address the testimony concerning the quantity of marijuana bought and sold by Francis's organization.

During the charging conference, the Court acceded to the express wishes of the defense *not* to include the jury instruction and interrogatory that the government had "request[ed] and recommend[ed]" on marijuana quantity.  Tr. 1601-02.  Although Golub did not explain his reasons, they were self-evident, given the considerable quantities of marijuana described in the testimony; encouraging jurors to dwell upon the image of well over one thousand pounds of illegal stores of marijuana could not have advanced his client's cause.  Moreover, by essentially conceding his client's guilt on the drug charge, Golub no doubt hoped that he had enhanced his credibility in the eyes of the jury and that his plea to acquit his client on the other charges might thereby carry some greater glint of sincerity.

That it was the government who asked for the jury instruction on drug quantity was not unusual; to the contrary, it was the United States Attorney's standard practice in drug trials at

---

[1] One kilogram (the statutory measure of drug quantity) equals 2.2 pounds; one pound is equal to .454 kilograms.

that time, when the impact of the Supreme Court's ruling in <u>Jones</u> earlier that year remained

uncertain, to "recommend[ ]" that drug quantity be determined by the jury "in order to avoid

issues on appeal." Tr. 1601.[2] Although <u>Apprendi</u> and its progeny were yet to be penned, this

Court was open to the government's request, <u>see</u> Tr. at 1601, but was offered no reason to grant

it over the specific defense request to the contrary. <u>See</u> Tr. 1600-01.

Post-trial, the defense maintained its de facto no-contest stance toward drug quantity,

having chosen not to address the subject either in the Rule 29 motion for a judgment of acquittal,

<u>see</u> Golub Letter Motion, dated October 20, 1999, or in the objections to Francis's Pre-Sentence

Report, <u>see</u> Golub Letter, dated March 1, 2000, even in the face of the PSR's estimates on

marijuana quantities distributed by Francis's organization (based on the pound-per-day

testimony), which totaled more than 700 kilograms. <u>See</u> PSR ¶¶ 22-27.[3] (Indeed, were this

figure challenged as inexact, the miscalculation could lie only in its having *under*-represented the

true amount of distributed marijuana for which Francis is responsible inasmuch as it takes

account of sales at only four of the six weed spots; for the other two locations, Probation agreed

that the amount was "unknown," PSR ¶ 22, and so did not include in the PSR total any estimate

for the six years' worth of sales at those two sites. <u>Id.</u>

## DISCUSSION

I.  <u>Basic 2255 Standards</u>

Relief "is generally available under § 2255 only for a constitutional error, a lack of

---

[2] Francis's trial occurred six months after <u>Jones v. United States</u>, 526 U.S. 227 (Mar. 24, 1999), but nine months before <u>Apprendi</u> (issued June 26, 2000).

[3] References are to the Revised Pre-Sentence Report dated April 20, 2000 which includes modifications and corrections not pertinent here.

jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000) (internal quotations and citations marks omitted). The Court's discretion to grant relief under section 2255 is to be exercised sparingly, for such applications "are in 'tension with society's strong interest in the finality of criminal convictions.'" Elize v. United States, 2008 WL 4425286, *5 (E.D.N.Y. Sept. 30, 2008) (NGG) (internal citations omitted). See also Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993) ("the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness," and "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation") (internal quotations and citations omitted).

Under the rules that "'the courts have established [ ] that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack,'" id. (internal Supreme Court citations omitted), only a limited category of claims is even cognizable under section 2255. See United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) ("2255 petition cannot be used to relitigate questions which [sic] were raised and considered on direct appeal") (internal quotation and citations omitted); United States v. Frady, 456 U.S. 152, 165 (1982) (section 2255 may not be used to challenge the legality of matters that were not first raised on direct appeal); Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007) (same).

Additionally, "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998) (internal quotations omitted). Claims of ineffective assistance of counsel,

however, "may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003).

## II.    The *Booker* Claim

Francis cannot avail himself of the Booker decision because his conviction became final nearly four years before Booker was issued,[4] and Booker lacks retroactive reach. Guzman v. United States, 404 U.S. F.3d 139, 141 (2d Cir.), cert. denied, 546 U.S. 1035 (2005). Francis's motion for leave to amend his 2255 application by adding a Booker claim is therefore denied.

Francis's request for leave to amend also asserts, however, that "[i]f the Supreme Court or any Circuit Court in the future make[s] [Booker] retroactive on collateral review," then Francis is hereby "reserving his rights pursuant to [Dodd v. United States, 543 U.S. 353 (2005)]." Mot. for Lv. to Amend, dated Dec. 23, 2005, at 1. But Dodd establishes no such right of "preservation." Instead, Dodd held that section 2255's one-year limitations period for invoking rights "newly recognized by the Supreme Court" begins to run from the date on which the Supreme Court "initially recognize[s]" the right, *not* the date, past or future, on which the right is declared to be retroactive. 543 U.S. at 358-59 (quoting the statutory language from the former ¶(6)(3), now ¶(f)(3), of §2255).

But, as just noted, the retroactivity of Booker is no longer an open question in this Circuit, see Guzman, and there is no conceivable basis for allowing Francis to lodge a barren, anticipatory Booker claim "just in case" Guzman is someday reversed. See, e.g., Brent v. United States, 2006 WL 1272591, *2 (N.D. Ohio May 9, 2006) (Dodd "does not stand for the

---

[4] Booker was issued on January 12, 2005, while Francis's conviction became final on April 23, 2001, the day the Supreme Court denied his petition for a writ of certiorari. See, e.g., United States v. Leon, 203 F. 3d 162, 163 (2d Cir. 2000) (defendant's conviction becomes final upon the Supreme Court's denial of petition for certiorari).

proposition that a prisoner can file a collateral motion and then have it held in abeyance indefinitely pending a future decision[ ] giving retroactive application to a new rule of law"), vacated on other grounds, 2006 WL 1786134 (N.D. Ohio June 26, 2006) (denying 2255 relief).

## III.    Apprendi

### A.    The Core *Apprendi* Claim Based on Drug Quantity

Although Apprendi, too, lacks retroactive reach, Coleman v. United States, 329 F.3d 77, 81-89 (2d Cir.), cert. denied, 540 U.S. 1061 (2003), the decision *does* apply to the conviction obtained against Francis because that conviction did not become final until ten months after the Supreme Court issued Apprendi.[5]

Francis's principal argument is addressed solely to his marijuana conspiracy and derivatively to the RICO convictions for which the drug activity is a racketeering act, and is classic Apprendi: *viz.*, Francis complains (i) that the "statutory maximum" sentence under 18 U.S.C. § 841 for the marijuana conviction charged in the indictment (i.e., involving an unspecified quantity of drugs) is 20 years, (ii) that he was sentenced to the 40-year "enhanced" maximum authorized by section 841(b)(1)(B) for distribution of marijuana in excess of 100 kilograms, and (iii) that marijuana quantity was not charged in the body of the indictment or found by a jury beyond a reasonable doubt but was, instead, determined by the Court under a preponderance standard.  See Motion, Ground Four; Francis Mem. Issues 4 and 5; First Motion

---

[5] Apprendi was decided on June 26, 2000; as noted, Francis's conviction did not become final until April 23, 2001.

Although the government also presses the theory that the Apprendi claim is procedurally barred because it was not raised on direct appeal, procedural bar is not the appropriate analytical rubric. As the discussion throughout this memorandum shows, it was defense counsel's strategic decision to forego an Apprendi claim.  In any event, the Court would be reluctant to declare the issue procedurally barred as a matter of law because Francis filed his own pro se brief with the Second Circuit, supplementing the brief of counsel, to alert the appellate court to his interest in the claim, thereby making a good-faith effort to litigate the claim.

to Amend, Issues 1-3.

Although the events as outlined by Francis do, standing alone, appear to run afoul of the Second Circuit's immediate post-Apprendi understanding of Apprendi's requirements, see, e.g., United States v. Luciano, 311 F.3d 146, 151 (2d Cir. 2002) ("[v]iolation of Appendi arises when a defendants sentenced on the basis of a triggering fact not found by the jury to a sentence that exceeds the maximum that would have been applicable but for the triggering fact"), relief from the marijuana (or derivatively, the RICO) conviction is nonetheless completely foreclosed, on the facts of this case, by the Supreme Court's decision in United States v. Cotton, 535 U.S. 625 (2002), which squarely controls here.

As in Cotton, (i) the evidence of the drug quantity on which Francis's sentence was based was, as reviewed above, "overwhelming" and "essentially uncontroverted," Cotton, 535 U.S. at 633 and, (ii) the defense did not challenge the Court's role as finder of those facts. Id. Under Cotton's "plain error" analysis, therefore, even if an Appendi error occurred, the theoretically impaired convictions must nevertheless stand because "there is no basis for concluding that [the alleged errors] seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Id. at 633 (quoting Johnson v. United States, 520 U.S. 461, 470 (1997)). As the Supreme Court explained:

> [i]In providing for graduated penalties in 21 U.S.C.
> § 841(b), Congress intended that defendants . . . involved in
> large-scale drug operations receive more severe punishment
> than those committing drug offenses involving lesser
> quantities. Indeed, the fairness and integrity of the criminal
> justice system depends on meting out to those inflicting the
> greatest harm on society the most severe punishments. The
> real threat then to the "fairness, integrity, and public
> reputation of judicial proceedings" would be if respondents,
> despite the overwhelming and uncontroverted evidence that
> they were involved in a vast drug conspiracy, were to
> receive a sentence prescribed for those committing less

substantial drug offenses because of an error that was never objected to at trial.

Id. at 634 (internal citation omitted).[6]

Indeed, the facts barring relief for Francis are even more compelling than those in Cotton for not only did Francis, like Cotton, "not object" to having drug quantity determined by the Court, he affirmatively requested as much. He cannot now seek to benefit from an alleged error that he invited as a matter of strategy. See, e.g., United States v. Hertular, 562 F.3d 433, 444 (2d Cir. 2009) (where defendant "not only failed to object to the challenged charge—an omission that would normally limit [Court's] review to plain error, see Fed.R.Crim.P. 30(d), 52(b)—[but] his counsel specifically 'endorse[d]' it . . . [s]uch endorsement might well be deemed a true waiver, negating even plain error review") (cataloguing Second Circuit authority); United States v. Ferguson, 758 F.2d 843, 852, 854 (2d Cir.1985) ("[h]aving obtained from the court precisely what they affirmatively sought, it ill behooves defendants now to complain;" alleged error rejected as "invited error"); United States v. Young, 745 F.2d 733, 752 (2d Cir.1984) ("not even the plain error doctrine permits reversal on the ground that the trial court *granted* a defendant's request to charge") (emphasis added). See generally United States v. Sharpe, 996 F.2d 125, 129 (6th Cir.) (under the "invited error" doctrine "a party may not complain on appeal of errors that he himself invited or provoked the [district] court . . . to commit"), cert. denied, 510 U.S. 951 (1993); but see United States v. Wells, 519 U.S. 482, 488 (1997) (discussing general validity of "invited error" doctrine, but nevertheless noting that the Supreme Court "ha[s] treated an inconsistency between a party's request for a jury instruction and its position before this Court as just one of several considerations bearing on whether to decide a question on which [it] granted

---

[6] The Supreme Court also "[f]reed [lower courts] from the view that indictment omissions"—such as drug quantity—deprive a court of jurisdiction." Id. at 631.

certiorari").[7]

## B. Challenges to Counsel's Handling of Drug Quantity

Bootstrapped to Francis's core Apprendi claim are two ineffective assistance of counsel claims. Francis specifically asserts that Golub rendered ineffective assistance by opposing the government's requested instruction on drug quantity, and by electing not to pursue an Apprendi claim on appeal, particularly because unlike at trial, the rule of Apprendi was no longer a matter of speculation at the time his appeal was briefed.[8] See Motion, Ground One; Francis Mem. Issues 1 and 4.

Given the foregoing analysis of Francis's core Apprendi claim, the Court readily concludes that Francis cannot establish that Golub's handling of drug quantity, either at trial or on appeal, amounted to constitutional ineffectiveness.

To show that the performance of counsel—be it trial or appellate—deprived him of his Sixth Amendment right, Francis bears the considerable burden of demonstrating that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In reviewing the record for ineffectiveness, this Court must be "highly deferential" to counsel's performance, since "'it is all too easy for a court, examining counsel's [performance] after it has

_____

[7] Franics's implied Apprendi claim—that that decision's heightened requirements apply when, as here, drug quantity and type trigger a statutory *minimum* (*viz.*, section 841(b)(1)(B)'s five-year minimum, triggered by a marijuana quantity of 100 kilograms or more)—reads too much into Apprendi. See United States v. King, 345 F.3d 149, 151 (2d Cir. 2003) ("Circuit and Supreme Court precedent make clear that imposition of a mandatory minimum sentence that does not exceed the otherwise applicable statutory maximum does not trigger Apprendi's requirements"), cert. denied, 540 U.S. 1167 (2004).

[8] Apprendi was decided on June 26, 2000; Francis's appellate brief was filed in August of that year and the Circuit heard argument three months later, on December 2, 2000.

proved unsuccessful, to conclude that a particular act or omission . . . was unreasonable.'" Pratt v. Greiner, 306 F.3d 1190, 1196 (2d Cir. 2002) (quoting Strickland, 466 U.S. at 689).

The critical inquiry under the performance prong is "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688.  Acts or omissions of counsel are considered "objectively unreasonable only if there was no tactical justification for the course taken." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (internal quotations and citation omitted), cert. denied, 549 U.S. 1257 (2007).

In the appellate context, Strickland requires that Francis "prove that appellate counsel selected grounds for appeal unreasonably, such as by 'omitt[ing] significant and obvious issues while pursuing issues that were clearly and significantly weaker.'" Gomez v. Brown, 655 F. Supp.2d 332, 347 (S.D.N.Y. 2009) (quoting Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000)). Appellate counsel, the Supreme Court has held, does not have a "*constitutional* duty to raise every nonfrivolous issue requested by a defendant." Jones v. Barnes, 463 U.S. 745, 747 (1983).

Indeed, the Court in Jones recognizes that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing one central issue if possible, or at most a few key issues." Id. at 751-52.  Accordingly, the Second Circuit "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside." Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (internal quotations and citation omitted), cert. denied, 546 U.S. 1184 (2006).

Under these standards, Francis cannot establish that Golub's decision not to contest drug quantity was not "reasonable considering all the circumstances." Strickland, 466 U.S. at 688. As already noted, it was a legitimate strategy to seek, through concession on the marijuana count,

to bolster the defense's overall credibility in the eyes of the jury. It was also legitimate as a matter of strategy to forego what would have been, given the testimony, a futile challenge to drug quantity. Finally, it was certainly within the range of acceptable strategic decisions to backburner the quite exorbitant amount of illegal narcotics in which his client had trafficked (and to spare the jury the need for testimony about pound-to-kilogram conversion). Golub's decision, a reasonable strategy based on the evidence, is therefore unassailable. See Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Furthermore, given the testimony already reviewed, a rational jury would have easily found that Francis was responsible for the distribution of more than 100 kilograms of marijuana, the threshold triggering section 841(b)(1)(B)'s enhanced penalty, so Francis cannot show that "the result of the proceeding would have been different," id. at 694, had Golub elected a different course. Francis, therefore, was not "prejudiced" within the meaning of Strickland by the strategic choices of counsel he now challenges.

At the appellate stage, the Strickland result is no different, despite the intervening issuance of the Apprendi decision. Golub wisely recognized, even pre-Cotton, that there was little point in arguing about Apprendi-based charging formalities in the face of the evidence on substantial quantities of marijuana, and that an about-face from his "no contest" trial-strategy would smack of gamesmanship, to say the least. It was also in his client's best interests to have pursued, as he did, issues relating directly to the principal defense and bearing directly on the more serious counts of conviction. See also Wheeler v. United States, 329 Fed.Appx. 632 (6th Cir. 2009) (counsel who "made a 'tactical decision to forego a procedural opportunity' to raise the Apprendi issue on appeal" did not render ineffective assistance).

**C.    The Other *Apprendi* Claims**

1.    <u>Aiding and Abetting</u>

Francis claims that the indictment was defective, and therefore deprived the Court of jurisdiction over his criminal proceedings, because several counts charged Francis as an aider and abettor as well as a principal, but did not include the actual language of 18 U.S.C. § 2, the federal aiding and abetting statute.[9]  Francis Mem. Issue 1 (A)(2).  The charging of Francis as an aider and abettor, however, did not violate any rights Francis has under <u>Apprendi</u>.

It is hornbook law that "'aiding and abetting' does not constitute a discrete criminal offense but only serves as a more particularized way of identifying the 'persons involved' . . . in the commission of the substantive offense, and serves to describe *how those 'person(s) involved,' committed the substantive offense*." <u>United States v. Oates</u>, 560 F.2d 45, 54 (2d Cir. 1977) (emphasis added) (quoting <u>United States v. Campbell</u>, 426 F.2d 547, 553 (2d Cir. 1970)). Indeed, because one who aids and abets is punished as a principal, "the proof [for aiding and abetting] must encompass the same elements as would be required to convict any other principal." <u>Hernandez v. United States</u>, 300 F.2d 114, 123 (1962).

Francis understandably seizes upon the <u>Apprendi</u> dictate to include all "elements" of any "crime" in the indictment, but the charging of aiding and abetting liability without the full statutory language does not implicate the concerns in <u>Apprendi</u> or otherwise cause a

---

[9] Although Francis frames this claim solely in terms of the federal aiding and abetting statute, the indictment shows that he was charged as an aider and abettor under *both* the federal *and* the state aiding and abetting provisions.  Specifically, he was charged in Racketeering Acts 1B, 2 and 3B (murder and conspiracy to murder) as a principal and an aider and abettor under New York law, New York Penal Law §20.00, and in Racketeering Act 4B (robbery of a drug dealer) solely as an aider and abettor under New York law, and in Counts Four, Five, Six, Eight, Nine, Eleven, Twelve, Thirteen and Fourteen as an aider and abettor under federal law, 18 U.S.C. § 2. The jury acquitted Francis of the murders underlying the charges in Racketeering Acts 1 and 2B and Counts Four through Six.

jurisdictional or Sixth Amendment violation.  Simply put, the charging of aider and abettor

liability, alone or in conjunction with principal liability, did not effect a shift from jury to Court

of the power to find the essential facts bearing on Francis's culpability.  The charging of aiding

and abetting likewise did not lower the burden of proof by which his criminal culpability had to

be established, nor, most critically, was it a fact triggering an enhancement of the penalty that

would be applied to one convicted as a principal.

In any event, the Court's instructions at Francis's trial furnished jurors with the complete

text of both the federal and state aider and abettor statutes, and thoroughly explained the

definition and "elements" of aider and abettor liability, see Court Exh. 1 at pp. 28-32, the

correctness of which Francis does not dispute.  Thus, even if the indictment was required to

include the language of 18 U.S.C. § 2 or N.Y. Penal Law § 20, Francis has not shown that the

omission "seriously affect[ed] the fairness, integrity, or public reputation of judicial

proceedings." Cotton, 535 U.S. at 633.

2.      "Malice Aforethought"

Francis likewise claims that the Court must vacate his convictions for murder and

conspiracy to murder because the indictment failed to charge "malice aforethought," which

Francis asserts is an essential element of those crimes.  Francis Mem. Issue 1(A)(3).  This claim

fails because "malice aforethought" is not an essential element of the crimes charged, namely,

second-degree murder under New York Penal Law § 125.25(1) (and conspiracy to commit the

same).  To be sure, the phrase "malice aforethought" appears in discussions of murder as once

understood in English common law, see, e.g., LaFave and Scott, Criminal Law, Hornbook Series

(West Publishing Co., 1972) at 7, and is an essential element of second degree murder under the

law of other states, see, e.g., Apprendi, 530 U.S. at 484 (discussing earlier Supreme Court

14

decision regarding "malice aforethought" under Maine law), but it is *not* an element of the crime under New York law. Francis was charged under subparagraph one of New York Penal Law § 125.25, which provides that a "person is guilty of murder in the second degree when [ ] [w]ith intent to cause the death of another person, he causes the death of such person or of a third person." See Apprendi, 530 U.S. at 485 n. 12 ("New York . . . had not made malice aforethought, or any describe mens rea, part of its statutory definition of second-degree murder").[10]

## IV. Interstate-Nexus Claims

Francis also argues that this Court lacked subject matter jurisdiction over his convictions for robbery and robbery conspiracy under the Hobbs Act, 18 U.S. C. § 1951 (counts 10 and 11),[11] and for RICO and RICO conspiracy, 18 U.S.C. § 1962 (c),(d) (counts 1 and 2) because, for each, there was an insufficient nexus to interstate commerce. See Francis Mem. at 9 .

The Court readily concludes that each of these claims is procedurally barred from consideration on Francis's section 2255 application. No legal or factual challenge to the interstate nexus element of the Hobbs Act or RICO counts was made at trial, or on direct appeal, and Francis has not made the required showing here of cause and prejudice or actual innocence (of those crimes) that might excuse the default. See Bousley, 523 U.S. at 622.[12]

---

[10]  Francis was also convicted of two counts of conspiracy to murder in violation of 18 U.S.C. § 1959 (a)(5) and one count of substantive murder, in violation of 18 U.S.C. § 1959 (a)(1), but Section 1959 does not contain a separate federal requirement of "malice aforethought." Rather, that statute, captioned "Violent crimes in aid of racketeering," provides certain penalties for crimes committed "in violation of the laws of any State or the United States" that also further racketeering.

[11] The Hobbs Act provides for criminal penalties for anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery ... or attempts or conspires so to do." 18 U.S.C. § 1951(a).

[12] Cause and prejudice, of course, may be shown through a meritorious ineffective

In any event, were the claims properly before this Court, they would be denied as meritless.

**A.     The Hobbs Act**

**1.  Controlling Law**

Francis's challenge to jurisdiction is abstract.  He relies heavily on United States v. Lopez, 514 U.S. 549 (1995), where the Court struck down, as exceeding Congress's authority under the Commerce Clause, a statute criminalizing the possession of a gun in a local school zone, and on United States v. Morrison, 529 U.S. 598 (2000), which held that Congress exceeded its authority under the Commerce Clause when it enacted 42 U.S.C.§ 13981, which provides a federal remedy for victims of gender-motivated violence, because, in the Court's view, the statute was "cast . . . over a more purely intrastate[ ] body of violent crime."  529 U.S. at 613. Francis appears to read Lopez and Morrison as sweeping curtailments of the authority of Congress to regulate what he regards as "garden variety" crimes of violence ordinarily defined by the laws of the various states.

Construed as liberally as reason permits, Francis's pro se papers do not appear to be arguing that the Hobbs Act is unconstitutional on its face under the Commerce Clause; rather, he appears to contend that, in his case, the required interstate nexus element as he believes it was reformulated by Lopez  and Morrison was not sufficiently established as a factual matter. At its core, his claim appears to be a challenge to the Court's jury instruction on the interstate commerce nexus—the element of the Hobbs Act that has been the subject of several Second Circuit decisions delineating the import of Lopez and Morrison and also announcing a "change"

_____

assistance of counsel claim, and Francis does advance a claim so styled, but only with respect to counsel's handling of drug quantity and Apprendi.  *Absent* from those ineffectiveness allegations, however, is any attack on counsel's decision not to challenge the interstate nexus element of the RICO or Hobbs Act counts.

in "nexus" jurisprudence that the Circuit believes is required by Booker.

In United States v. Parkes, 497 F.3d 220 (2d Cir. 2007), cert. denied, __ U.S. __, 128 S. Ct. 1320 (2008), the Circuit reaffirmed that, "[p]roving an effect on interstate commerce is . . . an element of a Hobbs Act offense, which must be proven beyond a reasonable doubt to a jury," and that "'proof that commerce was affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference.'" Parkes, 497 F.3d at 226 (internal citations omitted).

With respect to the effect of Lopez and Morrison, the Court left undisturbed both (i) United States v. Farrish, 122 F.3d 146 (2d Cir. 1997), cert. denied, 522 U.S. 1118 (1998), where the Court determined that Lopez did not alter the *de minimis* standard for Hobbs Act jurisdiction, 122 F.3d at 149, and (ii) the portion of United States v. Fabian, 312 F.3d 550 (2d Cir. 2002), cert. denied, 538 U.S. 1025 (2003) (hereinafter "Fabian I"), that concluded that "Morrison does not affect our requirement that the Government need only show a minimal effect on interstate commerce to support Hobbs Act jurisdiction," 312 F.3d at 555. See Parkes, 497 F.3d at 230.

Relying on the plain statutory language, which prohibits robberies that affect interstate commerce "in any way or degree," 18 U.S.C. § 1951(a), Parkes reaffirmed that, "[t]he jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect" on interstate commerce, "even though the effect is not immediate or direct or significant, but instead is postponed, indirect and slight," and that "[e]ven a potential or subtle effect on commerce will suffice." 497 F.3d at 230 (internal quotations and citations omitted).

The Court in Parkes, however, did abrogate the portion of Fabian I that had held that "as a matter of law . . . drug proceeds affect interstate commerce." Id., 497 F.3d at 228 (quoting Fabian, 312 F.3d at 555). Noting that Booker had "sharpened [its] focus on the separate

consideration of each element that composes an offense," id. at 229, the Court in Parkes held, in

light of Booker, that "Congressional findings . . . concerning the area regulated" could no longer

substitute for proof beyond a reasonable doubt and that any charge instructing the jury, expressly

or in substance, that interstate commerce is affected as a matter of law violates the Fifth and

Sixth Amendments.  Id. (internal citations omitted).

Following Parkes's abrogation of the Hobbs Act ruling in Fabian I, Fabian sought

section 2255 relief on the ground that the nexus instructions in his case were unconstitutional.

See Fabian v. United States, 2007 WL 2480164 (E.D.N.Y.  Aug. 28, 2007) (DGT) ("Fabian II").

Judge Trager denied relief; the critical portion of his analysis is as follows:

> Moreover, although the jury was, in light of Parkes, erroneously
> instructed that the interstate commerce element was satisfied as a
> matter of law, there was ample evidence in the record that Fabian
> believed he was stealing from a loan shark and that he was stealing
> drug trafficking proceeds that originated in Miami. . . .
> [Furthermore] [e]ven if the jury had been left to determine whether
> the proceeds of narcotics and loan sharking activities involved
> would have affected interstate commerce, instead of being
> instructed to that effect as a matter of law, given the de minimis
> showing required, the jury would have found this jurisdictional
> element satisfied [  ] as to the second robbery . . .
>
> [But] [a]s to the first robbery, although there was no proof in the
> record that loan sharking affected interstate commerce, if, at the
> time of Fabian's trial, the law in the Second Circuit required the
> government to prove that the object of the robberies would have
> had a de minimis effect on interstate commerce, the government
> would no doubt have offered proof of the interstate nature of loan
> sharking and I would no doubt have allowed such proof to be
> offered. [ ] Thus, there is no possibility that Fabian would have
> been "exonerated" as a result of this "intervening change in the
> law," as required by the Second Circuit.

Fabian II, 2007 WL 2480164 at *7 (internal citations omitted).

In affirming Judge Trager, the Second Circuit explained, in pertinent part, that "even

assuming Parkes established a new constitutional rule, the Supreme Court has not made any such

new rule retroactive to cases on collateral review." <u>Fabian v. United States</u>, 555 F.3d 66, 67 (2d Cir. 2009) ("<u>Fabian III</u>").

**2. Analysis**

The only portion of this Court's instruction on the Hobbs Act nexus requirement that arguably implicates <u>Parkes</u> is the following: "if you find that the object of the alleged robbery on July 9, 1996 was in whole or in part narcotics or narcotics proceeds, you should find the interstate commerce element has been satisfied." Court Exh. at 66. (The same language was used with respect to the substantive Hobbs Act and Hobbs Act conspiracy counts; <u>see</u> Court Exh. at 64). Assuming without deciding that that this language does not comport with <u>Parkes</u>, relief under section 2255 is nevertheless unwarranted.

First, the instruction was not improper under pre-<u>Parkes</u> law and, although <u>Fabian III</u> did not squarely and finally decide the question, the language just quoted, 555 F.3d at 67, leaves it doubtful that <u>Parkes</u>, decided six years after Francis's conviction became final, could apply retroactively on collateral review. Second, even if the rule of <u>Parkes</u> applied to Francis's conviction, that conviction must stand for the same reasons as Fabian's, as explained by Judge Trager in <u>Fabian III</u>. The testimony that Francis transported marijuana to Washington, that he directed members of his gang to travel to Texas to purchase marijuana, and that he sent the proceeds of drug sales home to Trinidad was more than sufficient to establish the jurisdictionally required *de minimis* effect on interstate commerce.

**B.    RICO**

Francis's nexus-based argument with respect to his RICO and RICO conspiracy convictions is narrower than his Hobbs Act challenge. Relying again on general propositions from <u>Morrison</u> and <u>Lopez</u>, Francis argues as follows: of the six crimes he was convicted of

committing as "racketeering acts," five are "local charges" carrying an "insufficient . . . jurisdictional nexus to a federally regulated commerce activity," Francis Mem. at 9, and the sixth, the marijuana conspiracy (act 7), is invalid under <u>Apprendi</u>.

Even if Francis's view of the RICO interstate nexus requirement were correct, his argument fails on its own terms, given this Court's rejection of his <u>Apprendi</u> challenge to the marijuana conviction. But more critically, Francis misapprehends the interstate nexus element of RICO: although five of the racketeering acts (involving murder, robbery and conspiracy) are all state-law crimes, RICO does not require that the individual predicate acts affect interstate commerce. <u>See</u> 18 U.S.C. § 1961(1)(A) (defining racketeering activity to include "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year"). Instead, it is only the activities of the "enterprise" that must affect interstate commerce. <u>See</u> 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt"). Francis's jurisdictional challenge to his RICO and RICO conspiracy convictions therefore fails.

## V.     The Vienna Convention

Francis amended his application a second time to include both substantive claims and ineffective assistance of counsel claims relating to alleged violations of his rights under the

Vienna Convention.  Article 36(1)(b) of the Vienna Convention "provides that the authorities of a 'receiving state'—here, the United States—shall, without delay, inform any detained national of his right to have the 'consular post' of a 'sending state'—here, [Trinidad]—notified of his detention."  United States v. Bustos De La Plava, 268 F.3d 157, 163 (2d Cir. 2001) (citing Vienna Convention, art. 36(1)(b) 21 U.S.T. 77, 596 U.N.T.S. 261 (the "consular-notification provision")).  Francis did not raise any claim related to Article 36 at trial or on appeal, and because he fails to show cause and prejudice, he cannot now raise it on collateral review.

Lacking any other possible explanation, Francis has again resorted to an ineffective assistance claim to attempt to show cause and prejudice.  But Francis cannot show that Golub's performance fell below an objective standard of reasonableness for failing to preserve a claim that had almost no chance of success.  As the Supreme Court recently reiterated in a case involving the consular-right provision, international treaties "generally do not create private rights or provide for a private cause of action in domestic courts."  Medellin v. Texas, 552 U.S. 491, 506 n.3 (2008).  Furthermore, the Second Circuit has specifically stated that Article 36 "do[es] not create any fundamental rights for a foreign national."  United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (holding that a violation of Article 36(1)(b) is not a basis to dismiss an indictment.  Francis points to no authority holding to the contrary and thus cannot show that Golub's performance was deficient.

Francis's additional claims that Golub was ineffective for allegedly failing to inform him of his rights arising under Article 36 also lacks merit.  As then District Judge Raggi explained,

> Consular notification generally serves to ensure that a foreign national charged
> with a violation of American law is visited by an official representative of his
> native country who can explain to him his rights as a criminal defendant in the
> United States, most notably his right to legal counsel and his right to remain
> silent. . . Of course, once defense counsel enters a notice of appearance, he
> assumes full responsibility for safeguarding these and any other legal rights for a

defendant. Thus, whatever obligations the Vienna Convention may put on federal officials to give consular notification when a foreign national is arrested, a defense attorney cannot be labeled ineffective for failing to advise his client of the right to speak to a diplomatic official who could do no more to protect his rights than counsel himself.

United States v. Arango, 1999 WL 1495422, *3 (E.D.N.Y. Dec. 29, 1999) (RR).   In any event, Francis has not shown that he sustained any prejudice as a result of Golub's alleged failure to discuss the Vienna Convention with him.


**CONCLUSION**

For all of the foregoing reasons, Francis's application for relief under 28 U.S.C. § 2255 is denied in its entirety.   Because Francis has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.  The Clerk of Court is directed to close this case.



SO ORDERED.

Dated:  Brooklyn, New York
           March 31, 2010

                                        s/ Judge Raymond J. Dearie

                                        _____
                                        RAYMOND J. DEARIE
                                        United States District Judge